No. 10-16645

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| United States of America,<br><br>               Plaintiff-Appellee,<br><br>v.<br><br>State of Arizona; and Janice K. Brewer, Governor of the State of Arizona, in her Official Capacity,<br><br>               Defendants-Appellants. | Appeal from the United States District Court for the District of Arizona<br><br>No. CV 10-1413-PHX-SRB |

## APPELLANTS' OPENING BRIEF

John J. Bouma (Ariz. Bar #001358)
Robert A. Henry (Ariz. Bar #015104)
Joseph G. Adams (Ariz. Bar #018210)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Telephone: (602) 382-6000
Fax: (602) 382-6070
jbouma@swlaw.com
bhenry@swlaw.com
jgadams@swlaw.com

Joseph A. Kanefield (Ariz. Bar #015838)
Office of Governor Janice K. Brewer
1700 W. Washington, 9th Floor
Phoenix, AZ 85007
Telephone: (602) 542-1586
Fax: (602) 542-7602
jkanefield@az.gov

Attorneys for Defendants-Appellants State of Arizona; and Janice K. Brewer, Governor of the State of Arizona

# **TABLE OF CONTENTS**

<u>**SECTION**</u>                                                    <u>**PAGE NO.**</u>

TABLE OF CASES AND AUTHORITIES ............................................................v

INTRODUCTION .........................................................................................1

STATEMENT OF JURISDICTION..........................................................3

ISSUES PRESENTED................................................................................3

PROCEDURAL HISTORY.......................................................................5

STATEMENT OF FACTS .........................................................................6

      A.     Congress enacted federal immigration laws and policies that evidence an intent to encourage state and local cooperation............................................................................6

      B.     State and local assistance with the enforcement of federal immigration law .......................................................9

      C.     The impact of illegal immigration in Arizona ...................10

      D.     Arizona enacts S.B. 1070 consistent with Congress' policy of state and federal cooperation .................................12

      E.     Summary of the statutes at issue on this appeal .................13

            1.     Section 2 (A.R.S. § 11-1051)........................................13

            2.     Section 3 (A.R.S. § 13-1509)........................................14

            3.     Section 5(C) (A.R.S. § 13-2928(C)) .............................14

            4.     Section 6 (A.R.S. § 13-3883(A)(5)) ............................15

SUMMARY OF ARGUMENT ..............................................................15

LEGAL DISCUSSION ........................................................................17

I.    Standard of Review.................................................................17

      A.    Standard of review for the grant of a preliminary
            injunction ..................................................................17

      B.    Standard for issuance of a preliminary injunction...............18

      C.    Standard for facial challenges to a statute's
            constitutionality.........................................................19

      D.    Standard for demonstrating federal preemption of state
            law...........................................................................21

II.   The District Court Erred In Concluding that It Is Likely the United
      States Will Prevail on Its Preemption Claims...............................23

      A.    The district court erred in concluding that section 2(B) of
            S.B. 1070 likely impedes congressional objectives............23

            1.    Enforcing section 2(B) will not impose an
                  unconstitutional burden on lawfully-present aliens....................24

                  a.    The district court erroneously concluded that
                        section 2(B) was likely preempted based on
                        burdens it could potentially impose on a
                        narrow category of aliens....................................24

                  b.    The district court incorrectly concluded that it
                        would frustrate Congress' intent to increase
                        the assistance Arizona's law enforcement
                        officers provide in the enforcement of federal
                        immigration laws ..............................................26

                  c.    The district court's factual findings were
                        clearly erroneous..............................................30

            2.    Congress has expressly intended that state and local
                  officers will utilize federal resources in the manner
                  section 2(B) requires.................................................33

a.     The district court's conclusion that section 2(B) will impermissibly burden federal resources ignores Congress' intent ....................................34

b.     The district court's factual finding that section 2(B) will burden federal resources was clearly erroneous.........................................37

3.    As a matter of law, the district court incorrectly interpreted the second sentence of section 2(B) to mean that officers must determine the immigration status of *every* arrestee ................................................39

B.    Because section 3 mandates compliance with federal law, it cannot stand as an obstacle to congressional objectives ............................................................43

C.    Section 5(C) neither conflicts with federal law nor regulates in a federally-occupied field....................................46

1.    IRCA does not occupy the field and preclude all state regulation of alien employees who perform unauthorized work ......................................................48

a.     IRCA's express preemption provision demonstrates that Congress did not intend to occupy the field.................................................48

b.     The fact that Congress considered but did not enact employee sanctions does not reflect a "clear and manifest" intent to occupy the field ................50

2.    Section 5(C) does not conflict with any provision of IRCA .......................................................................52

D.    Because there are permissible applications of section 6, the district court erred in concluding that the provision is unconstitutional on its face ................................................53

1.    The district court failed to apply the correct legal standard for the United States' facial challenge to section 6 .......................................................................53

- iii -

   2.    The district court failed to presume that Arizona
         will properly implement section 6 and to construe
         section 6 to preserve its constitutionality......................................54

   3.    The district court disregarded evidence
         demonstrating that section 6 can be applied in a
         constitutional manner...................................................................55

III. The District Court's Errors With Respect to the United States'
     Likelihood of Success on the Merits Requires Reversal of the
     District Court's Conclusions With Respect to the Non-Merits
     Factors .........................................................................................................57

CONCLUSION .......................................................................................................59

# <u>TABLE OF AUTHORITIES</u>

## <u>Federal Cases</u>

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev.*
   *Comm'n*, 410 F.3d 492 (9th Cir. 2005) ............................................................45

*Altria Group, Inc. v. Good*, 129 S. Ct. 538 (2008) ................................21, 22, 27, 49

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) ........................36

*Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572 (1987) ...........................20

*Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856 (9th Cir. 2009),
   *cert. granted by* 130 S. Ct. 3498 (2010) ........................................................passim

*City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999).............................7, 8

*Costco Wholesale Corp. v. Maleng*, 522 F.3d 874 (9th Cir. 2008) .........................43

*Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780
   (9th Cir. 2008)........................................................................................19, 40, 54

*De Canas v. Bica*, 424 U.S. 351 (1976).................................................22, 34, 44, 47

*Estrada v. Rhode Island*, 594 F.3d 56 (1st Cir. 2010) ........................................30, 32

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995).................................................48

*Garrett v. City of Escondido*, 465 F. Supp. 2d 1043 (S.D. Cal. 2006) ...................37

*Gonzales v. Peoria,* 722 F.2d 468 (1983), *overruled on other grounds by*

    *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999) ........................62

*Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754 (9th Cir. 2004) .................17

*Haw. Housing Auth. v. Midkiff*, 467 U.S. 229 (1984)..............................................19

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ...............................................28, 29, 43, 44

*Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005 (9th Cir. 2007) ................................22

*INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984) ...................................................29, 30

*INS v. Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183 (1991) ..............................33

*Marsh v. United States*, 29 F.2d 172 (2d Cir. 1928)................................................59

*Martinez v. Nygaard*, 831 F.2d 822 (9th Cir. 1987) ................................................29

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ............................................20, 45, 46

*Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc.*, 423 F.3d

    1056 (9th Cir. 2005).......................................................................................48, 49

*Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506 (2d Cir. 2005)........................18

*Muehler v. Mena*, 544 U.S. 93 (2005) ....................................................................30

*North Dakota v. United States*, 495 U.S. 423 (1990) ........................................28, 35

*Nw. Central Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493

    (1989) ......................................................................................................21, 50

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ..........................................19, 54

*Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430

   (5th Cir. 1981) ........................................................................................57

*P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495

   (1988) ....................................................................................................50

*Rizzo v. Goode*, 423 U.S. 362 (1976) ..............................................................18, 24

*Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002) ...............................................51

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ....................................17

*Transcont'l Pipe Line Corp. v. State Oil & Gas Board of Miss.*, 474 U.S. 409

   (1986) ....................................................................................................50

*United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484

   U.S. 365 (1988) ......................................................................................40

*United States v. Booker*, 543 U.S. 220 (2005) ..............................................19, 54

*United States v. Price*, 361 U.S. 304, 310-11 (1960) ............................................51

*United States v. Rodriguez-Arreola*, 270 F.3d 611 (8th Cir. 2001) .......................30

*United States v. Salerno*, 481 U.S. 739 (1987) ..........................................20, 24, 53

*United States v. Santana-Garcia*, 264 F.3d 1188 (10th Cir. 2001) ................25, 26

*United States v. Soriano-Jarquin*, 492 F.3d 495 (4th Cir. 2007) ...................passim

*United States v. Tarango-Hinojos*, 791 F.2d 1174 (5th Cir. 1986) ..................25, 26

*Wash. State Grange v. Wash. State Republican Party*,

    552 U.S. 442 (2008) .......................................................................20, 26

*Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365 (2008) ....................18, 57

*Worm v. Am. Cyanamid Co.,* 970 F.2d 1301, 1307 (4th Cir. 1992) ........................46

*Wyeth v. Levine*, 129 S. Ct. 1187 (2009) ................................... 22, 28, 34, 35, 46, 47

*Yakus v. United States*, 321 U.S. 414 (1944) ...........................................................19

*Zadvydas v. Davis,* 533 U.S. 678 (2001) .................................................................42

**State Cases**

*Ariz. Downs v. Ariz. Horsemen's Found.*, 637 P.2d 1053 (Ariz. 1981)..................40

*In re Jose C.*, 198 P.3d 1087 (Cal. 2009), *cert. denied*, 129 S. Ct. 2804

    (2009) ................................................................................................46

*Porter v. Triad of Ariz. (L.P.)*, 52 P.3d 799 (Ariz. Ct. App. 2002) ........................40

*State v. Ramsey*, 831 P.2d 408 (Ariz. Ct. App. 1992) ..............................................42

**Federal Statutes**

8 U.S.C. §§ 1101-1778 ...............................................................................................6

8 U.S.C. § 1101(a)(43)...............................................................................................55

8 U.S.C. § 1103 .................................................................................6

8 U.S.C. § 1226(d)(1)(C) ...............................................................56

8 U.S.C. § 1227(a)(2)(A)(iv) .........................................................56

8 U.S.C. § 1228(c) ..........................................................................55

8 U.S.C. § 1252c .............................................................................54

28 U.S.C. § 1292(a)(1) .....................................................................3

8 U.S.C. § 1304(e) ...................................................................14, 29

8 U.S.C. § 1324a(b)(2) ....................................................................52

8 U.S.C. § 1324a(h)(2) ..............................................................44, 49

28 U.S.C. § 1331 ...............................................................................3

8 U.S.C. § 1357(g) ...............................................................8, 38, 55

8 U.S.C. § 1357(g)(10).................................................................8, 27

8 U.S.C. § 1373 ......................................................................9, 36, 37

8 U.S.C. § 1373(a) ..........................................................9, 12, 27, 36

8 U.S.C. § 1373(c) ......................................................9, 13, 27, 36, 37

8 U.S.C. §§ 1621 through 1625 ......................................................44

8 U.S.C. § 1644 ............................................7, 8, 12, 27, 36, 37

H.B. 2162 ....................................................................................1, 3, 12, 42

Pub. L. 109-13, 119 Stat. 302 (May 11, 2005) ........................................44

Pub. L. 414, 182 Stat. 66 (June 7, 1952).................................................6

S.B. 1070...........................................................................................passim

**State Statutes**

A.R.S. § 11-1051.................................................................................13

A.R.S. § 11-1051(B) ...........................................................................5

A.R.S. § 11-1051(D) ..........................................................................55

A.R.S. § 13-1509................................................................... 5, 14

A.R.S. § 13-2928(C) ............................................................... 5, 13, 14

A.R.S. § 13-2929................................................................................13

A.R.S. § 13-3883(A) ............................................................... 15, 53

A.R.S. § 13-3883(A)(5) ........................................................... 5, 15, 53, 55

A.R.S. § 13-3903................................................................................32

A.R.S. § 13-3906(A) ..........................................................................41

**Federal Regulations**

16 C.F.R. Part 305 (2001) ...................................................................45

# Introduction

To combat what the district court described as "rampant illegal immigration, escalating drug and human trafficking crimes, and serious public safety concerns," the Arizona Legislature enacted the "Support Our Law Enforcement and Safe Neighborhoods Act," as amended ("S.B. 1070" or the "Act").[1] The harm that Arizona and its citizens are suffering as a result of illegal immigration is well documented and undisputed. The Department of Homeland Security ("DHS") has demonstrated its inability (or unwillingness) to enforce the federal immigration laws effectively. The Act's primary purpose, therefore, is to enhance the assistance Arizona and its law enforcement officers provide in enforcing federal immigration laws. The Arizona Legislature carefully crafted the Act to ensure that Arizona's officers would do so in compliance with existing federal laws and pursuant to well-established criminal and constitutional law and practice.

Rather than welcome this much-needed assistance, the United States sued the State of Arizona and its Governor, Janice K. Brewer (collectively "Arizona") twenty-three days before the Act's effective date, raising a facial challenge to S.B. 1070 principally on preemption grounds. Concurrently with the filing of its complaint, the United States moved for a preliminary injunction to prevent Arizona

---

[1]     S.B. 1070 as used herein refers to S.B. 1070 as amended by H.B. 2162.

from enforcing the Act. The fundamental premise of the United States' argument is that DHS has exclusive authority to determine whether and to what extent it may receive assistance from state and local authorities in the enforcement of federal immigration laws. The United States' position, however, is contradicted by express directives from Congress and well-established preemption law. Congress has repeatedly encouraged cooperation and assistance from state and local authorities in enforcing federal immigration laws. And it is Congress' intent—not DHS's—that controls whether S.B. 1070 is preempted.

Nevertheless, the district court preliminarily enjoined Arizona from enforcing sections 2(B), 3, 5(C), and 6 of the Act. In doing so, the district court misapplied the law by: (1) misconstruing well-established principles of federal preemption law; (2) disregarding its obligation to preserve the constitutionality of the Act's provisions and to presume that Arizona will implement the provisions in a constitutional manner; and (3) ignoring the United States' burden on a facial challenge to show that the provisions of S.B. 1070 are unconstitutional in *all* of their applications. Instead, the district court granted the United States' request for the extraordinary remedy of injunctive relief by accepting the United States' speculation regarding the *potential* burden that enforcing sections 2(B), 3, 5(C), and 6 *might* impose on narrow categories of lawfully-present aliens in *hypothetical*

and *speculative* scenarios, and the *possible* impact to DHS's achievement of its newly-established objectives.

The district court's injunction cannot stand. No legal or factual basis supports the district court's conclusion that the United States is likely to establish that sections 2(B), 3, 5(C), and 6 of S.B. 1070 are facially preempted.

## Statement of Jurisdiction

The United States commenced this action against the State of Arizona and its Governor, Janice K. Brewer, in her official capacity on July 6, 2010. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345. On July 28, 2010, the district court entered a preliminary injunction enjoining portions of S.B. 1070, as amended by H.B. 2162. Arizona filed its preliminary injunction appeal on July 29, 2010. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## Issues Presented

1.    With respect to the district court's finding that the United States is likely to succeed on the merits of its claims that sections 2(B), 3, 5(C), and 6 are facially preempted, the issues presented are:

    a.    Whether the United States can demonstrate that section 2(B) is facially preempted based on the potential that enforcement of section 2(B) could burden certain lawfully-present aliens or federal resources, even though section

- 3 -

2(B) merely asks Arizona's law enforcement officers to exchange information with ICE that Congress has expressly required ICE to receive and provide.

      b.     Whether section 3 stands as an obstacle to the achievement of current congressional objectives by mandating compliance with two specific federal immigration registration laws.

      c.     Whether Congress' decision not to impose sanctions on employees who perform unauthorized work reflects a "clear and manifest" intent to prohibit states from doing so.

      d.     Whether the warrantless arrest provision in section 6 can be facially preempted based on speculation that Arizona's law enforcement officers might implement it in an unconstitutional manner.

      2.     With respect to the district court's finding as to the non-merits factors, the sole issue presented is whether it is in the public interest to prohibit Arizona from acting consistently with congressional objectives to address "the rampant illegal immigration, escalating drug and human trafficking crimes, and serious public safety concerns" that the federal government has admittedly failed to address authoritatively.

- 4 -

Attached at the end of this brief is an Addendum containing the full text of the enjoined provisions of S.B. 1070 and the pertinent federal statutes.

## Procedural History

On July 6, 2010, the United States filed its complaint and moved for a preliminary injunction to enjoin enforcement of S.B. 1070. [ER 2.] Arizona opposed the motion. [ER 483 (doc. 63).] Following a hearing, the district court issued an order enjoining four provisions of S.B. 1070 based on its conclusion that the United States was likely to succeed on its claims that federal law preempts each of these provisions: section 2(B) creating A.R.S. § 11-1051(B); section 3 creating A.R.S. § 13-1509; the portion of section 5 creating A.R.S. § 13-2928(C); and section 6 creating A.R.S. § 13-3883(A)(5). [ER 3-4.]

Because it concluded that the United States was likely to succeed on the merits with respect to the preemption of sections 2(B), 3, 5(C), and 6, the district court also concluded: (1) that "[i]f enforcement of the portions of S.B. 1070 for which the Court finds a likelihood of preemption is not enjoined, the United States is likely to suffer irreparable harm" and (2) that the balance of equities weighed in favor of the United States because "it is not in the public interest for Arizona to enforce preempted laws." [ER 34-35.] Arizona filed this preliminary injunction appeal the next day. [ER 37-43.]

## Statement of Facts

### A.   Congress enacted federal immigration laws and policies that evidence an intent to encourage state and local cooperation

The Immigration and Nationality Act ("INA"), which Congress originally enacted in 1952,[2] regulates the conditions upon which aliens may enter and remain in the country and, with limited exceptions, charges the Secretary of DHS with the duty of administering and enforcing the nation's immigration and naturalization laws. *See* 8 U.S.C. § 1103. The DHS agencies charged with securing the nation's borders are: (1) U.S. Immigration and Customs Enforcement ("ICE"); (2) U.S. Customs and Border Protection; (3) the Transportation Security Administration; and (4) the U.S. Coast Guard. ICE is responsible for interior enforcement of the federal immigration laws. Its mandate includes, among other things, "identifying criminal aliens for removal" and "detaining illegal immigrants and ensuring their departure (or removal) from the United States." [*See* ER 412.]

The federal government has faced two significant obstacles in the interior enforcement of its immigration laws: lack of resources and obstruction at the state or local law enforcement level. First, "[h]istorically, Congress and [DHS] have devoted over five times more resources in terms of staff and budget on border enforcement than on interior enforcement." [ER 307; *see also* ER 171 & 174.]

---

[2]     Pub. L. 414, 182 Stat. 66 (June 27, 1952). The INA is codified at 8 U.S.C. §§ 1101-1778.

Interior enforcement problems have had serious consequences. [ER 177-78.] For example, the Center for Immigration Studies found that eight of the 48 *al Qaeda* foreign-born terrorists operating in the United States since 1993 worked in the United States illegally. [ER 321; *see also* ER 334 n.64 (referencing a Government Accountability Office study finding that of 35,318 criminal aliens released between 1994 and 1999, at least 11,605 went on to commit new crimes).]

Second, certain state and local governments have implemented policies that either discourage or severely restrict law enforcement officers from assisting in enforcing federal immigration laws—sanctuary city policies. *See, e.g., City of New York v. United States*, 179 F.3d 29, 31 (2d Cir. 1999) (addressing a New York City Executive Order prohibiting, with limited exceptions, "any City officer or employee from transmitting information regarding the immigration status of any individual to federal immigration authorities").

In 1996, Congress enacted several statutes that established a federal policy of encouraging cooperation among federal, state, and local authorities in enforcing the federal immigration laws. First, Congress enacted 8 U.S.C. § 1644, which provides: "Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [ICE] information regarding the immigration status,

- 7 -

lawful or unlawful, of an alien in the United States." Congress' stated purpose for enacting 8 U.S.C. § 1644 was "to give State and local officials the authority to communicate with [ICE] regarding the presence, whereabouts, or activities of illegal aliens" based on Congress' belief that: "[I]mmigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended." *City of New York*, 179 F.3d at 32 (quoting H.R. Rep. No. 104-725, at 383 (1996)).

Second, Congress enacted 8 U.S.C. § 1357(g), which authorizes the Attorney General to enter into agreements with states and their political subdivisions for the purpose of qualifying state and local law enforcement officers to function, in effect, as immigration officers. Recognizing the importance of continued assistance from state and local law enforcement, § 1357(g) also explicitly recognizes that no such agreement is required for state and local law enforcement officers or agencies:

> (A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or

> (B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

8 U.S.C. § 1357(g)(10).

- 8 -

Third, Congress enacted 8 U.S.C. § 1373. Subsections (a) and (b) of § 1373 prohibit restricting communications between federal, state, and local law enforcement officers regarding an individual's immigration status. *See* 8 U.S.C. § 1373(a)-(b).[3] Subsection (c) requires ICE to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). Congress enacted 8 U.S.C. § 1373 based on its finding that the "acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the [INA]." S. Rep. No. 104-249, at 19-20 (1996).

## B. State and local assistance with the enforcement of federal immigration law

In accordance with these federal policies and statutes, numerous federal, state, and local law enforcement agencies have successfully cooperated in the enforcement of federal immigration laws. [ER 336-43; *see also* ER 135-36, 142-43, 169, 196-97, 253 & 258.] In Rhode Island, for example, all state and local law

---

[3]     The full text of 8 U.S.C. § 1373 is included in the Addendum to this brief.

enforcement officers have been operating under an Executive Order since March 2008 to, among other things, "take steps to support the enforcement of federal immigration laws by investigating and determining the immigration status of all non-citizens taken into custody, incarcerated, or under investigation for any crime." [ER 144.] Rhode Island peace officers are further instructed to "notify[] federal authorities of all illegal immigrants discovered as a result of such investigations." *Id.*

Peace officers in many jurisdictions in Arizona have also been operating under these types of procedures and practices. [*See*, *e.g.*, ER 114 & 123-24.] Indeed, other than officers operating under the "hand-cuffs" of sanctuary city policies, officers in Arizona routinely notify federal authorities when they run across persons whom they have reasonable suspicion to believe are not lawfully present in the United States. *Id.* In fact, ICE and Border Patrol "regularly rely upon local law enforcement to identify persons who they suspect are unlawfully present in the U.S." [ER 183.]

### C. The impact of illegal immigration in Arizona

Despite these strong congressional policies to maximize federal and state cooperation in enforcing federal immigration laws, interior enforcement remains weak. As President Obama aptly stated: "the system is broken" and "everybody knows it." [ER 398.] The federal government's inability (or unwillingness) to

respond effectively to illegal immigration issues has caused state and local law authorities to deal with the problems. [*See*, *e.g.*, ER 407 (Cochise County Sheriff Larry Dever testifying before the Senate Committee on Homeland Security and Governmental Affairs: "While securing our borders is clearly a federal responsibility, we are left with the problems associated by failure to do so.").]

These enforcement problems have been particularly acute in Arizona for two reasons. First, the federal government has failed to secure Arizona's border. [*See*, *e.g.*, ER 202-04; *see also* ER 362-67 (July 22, 2010 testimony of Center for Immigration Studies, Director of National Security Policy); & ER 380-88 (statements of Governor Napolitano regarding Arizona's "broken" border).] The Arizona border is so porous that it is estimated that 50% of the illegal aliens that enter the United States enter through Arizona. [ER 384.] And the nature of the illegal aliens entering across Arizona's border is of significant concern; for example, the Arizona Department of Corrections has estimated that criminal aliens now make up more than 17% of Arizona prison's population and the Maricopa County Attorney's Office notes that 21.8% of the felony defendants in the Maricopa County Superior Court are illegal aliens. [ER 264-74 & 419.] The staggering costs of illegal immigration in Arizona are estimated to be $2 billion per year. [ER 429; *see also* ER 392 (noting that illegal alien incarceration costs as of January 4, 2010 exceeded $1 billion).]

- 11 -

Compounding the problem, several Arizona cities have implemented sanctuary policies—in direct contravention to 8 U.S.C. §§ 1373(a) and 1644—limiting or restricting law enforcement officers' ability to cooperate with the federal government in the enforcement of the federal immigration laws. [ER 129, 176-78.] This cooperative *non*-enforcement of the federal immigration laws has resulted in a significant presence of illegal aliens with criminal records in Arizona and numerous incidents of serious violence against Arizonans and damage and destruction to their property.[4] [*See*, *e.g.*, ER 119-20, 223-25, 227-30, 239 & 250-51.]

### D. Arizona enacts S.B. 1070 consistent with Congress' policy of state and federal cooperation

It was "against [this] backdrop of rampant illegal immigration, escalating drug and human trafficking crimes, and serious public safety concerns," as the district court aptly summarized the status, that the Arizona Legislature enacted S.B. 1070. Governor Brewer signed S.B. 1070 into law on April 23, 2010.[5] [ER 1.] S.B. 1070 was designed to eliminate sanctuary city policies, to encourage (and, in some instances, mandate) assistance with the enforcement of federal immigration

---

[4]     Arizona is not aware of any circumstance in which the federal government has taken any action against any sanctuary cities.

[5]     On April 30, 2010, Governor Brewer signed H.B. 2162, which amended S.B. 1070.

law, and to adopt state crimes that mirror existing federal laws pursuant to the State's broad police powers. *See generally* S.B. 1070.

### E. Summary of the statutes at issue on this appeal

The four provisions of S.B. 1070 at issue in this appeal are sections 2(B), 3, 5(C),[6] and 6.[7]

### 1. Section 2 (A.R.S. § 11-1051)

Section 2 of S.B. 1070 has twelve subsections. *See* S.B. 1070, § 2(A)-(L). At issue in this appeal is subsection B, which requires law enforcement officials or agencies of the state to make a reasonable attempt, when practicable, to determine a person's immigration status during a "lawful stop, detention or arrest" if there is a reasonable suspicion "that the person is an alien and is unlawfully present in the United States" and the investigation will not hinder or obstruct an investigation. In the enforcement of section 2(B), officers must determine the immigration status of arrestees prior to the person's release and verify that status with the federal government pursuant to 8 U.S.C. § 1373(c). Section 2 expressly prohibits law enforcement officials from "consider[ing] race, color or national origin in implementing [its] requirements . . . except to the extent permitted by the United

---

[6]   Section 5 of S.B. 1070 added two statutes—A.R.S. §§ 13-2928 and 13-2929. As used in this brief, section 5(C) refers to A.R.S. § 13-2928(C), the only provision of section 5 that the district court enjoined.

[7]   The Addendum to this brief contains the full text of these provisions.

States or Arizona Constitution," and requires that law enforcement officers implement its provisions "in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens." S.B. 1070, § 2(B), (L).

### 2.    Section 3 (A.R.S. § 13-1509)

Section 3 of S.B. 1070 provides that: "In addition to any violation of federal law, a person is guilty of willful failure to complete or carry an alien registration document if the person is in violation of 8 [U.S.C. §§] 1304(e) or 1306(a)." S.B. 1070, § 3(A). Section 3 imposes the same maximum penalties for violations of subsection (A) that Congress has imposed for violations of 8 U.S.C. § 1304(e). S.B. 1070, § 3(A), (H). The only substantive difference between this provision and the federal statutes is that section 3 is more limited as it "does not apply to a person who maintains authorization from the federal government to remain in the United States." S.B. 1070, § 3(F).

### 3.    Section 5(C) (A.R.S. § 13-2928(C))

Section 5(C) of S.B. 1070 makes it a Class 1 misdemeanor for "a person who is unlawfully present in the United States and who is an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor in this state."

- 14 -

#### 4. Section 6 (A.R.S. § 13-3883(A)(5))

Section 6 of S.B. 1070 adds to the authority Arizona peace officers have under A.R.S. § 13-3883(A) to arrest a person without a warrant by authorizing such arrests when "the officer has probable cause to believe . . . [t]he person to be arrested has committed any public offense that makes the person removable from the United States."

### Summary of Argument

The preliminary injunction should be vacated as to each of the four sections of S.B. 1070 that the district court enjoined. Under a proper application of the facts and law, the district court could not have found that the United States is likely to prevail on the merits or that the injunction serves the public interest.

As to section 2(B), the district court first ignored its obligation to construe the statute so as to preserve its constitutionality. Second, the district court disregarded the extremely high burden the United States has to demonstrate its entitlement to the extraordinary remedy of injunctive relief on a facial challenge by making a clear showing that the provision is unconstitutional in all of its applications.[8] Instead, the district court improperly enjoined section 2(B) based solely on its conclusion that section 2(B) is "*likely* to burden legally-present aliens"

---

[8]     The district court acknowledged this standard [ER 11], but did not appear to apply it.

and "*likely* to impermissibly burden federal resources." [ER 17 (emphasis added).]
Third, the district court ignored the federal statutes Arizona identified evidencing
Congress' intent to encourage cooperative enforcement of the federal immigration
laws and, instead, found preemption based solely on Congress' intent in enacting
the Alien Registration Act of 1940—an act that Congress superseded with the INA
in 1952.

As to section 3, the district court erred by misconstruing that section as
conflicting with the federal government's alien registration laws despite the fact
that section 3 mirrors these federal laws.  Section 3 reinforces Congress' objectives
and carries out Congress' intent to foster federal and state cooperation.

As to section 5(C), the district court noted, but failed to apply, the
presumption against preemption, confused the concepts of field preemption and
conflict preemption, and erroneously found that the Immigration Reform and
Control Act of 1986 ("IRCA") occupies the field of employment of illegal aliens.

The district court erred in enjoining section 6 because section 6 can be
constitutionally applied and implemented.

Finally, because the district court erred in concluding that the United States was likely to succeed on the merits of its claims, the district court also erred in concluding that the injunction serves the public interest.[9]

## Legal Discussion

## I

## Standard of Review

### A.    Standard of review for the grant of a preliminary injunction

A "district court's grant of a preliminary injunction is reviewed for 'abuse of discretion' and should be reversed if the district court based 'its decision on an erroneous legal standard or on clearly erroneous findings of fact.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009) (citation omitted); *Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 760 (9th Cir. 2004). A district court's factual findings are subject to a clearly erroneous standard, but the district court's application of the applicable legal principles "is subject to de novo review." *Stormans*, 586 F.3d at 1119. "[B]ecause '[i]njunctive relief . . . must be tailored to remedy the specific harm alleged, . . . [a]n overbroad injunction is an abuse of discretion.'" *Id.* (quotation omitted).

---

[9]    The district court based its findings that the United States is likely to suffer irreparable harm and that the public interest weighs in favor of issuing the injunction entirely on its conclusion that these provisions are likely preempted.

- 17 -

## B.     Standard for issuance of a preliminary injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008) . "[I]t has long been held that an injunction is 'to be used sparingly, and only in a clear and plain case.'" *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (quoting *Irwin v. Dixion*, 9 How. 10, 33 (1850)); *see also Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005) (a preliminary injunction "'is an extraordinary and drastic remedy . . . that should not be granted unless the movant, by a clear showing, carries the burden of persuasion'") (citation omitted).

Here, the United States bears an especially heavy burden because it seeks to enjoin a state in the exercise of its broad police powers. "When a plaintiff seeks to enjoin the activity of a government agency . . . his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs.'" *Rizzo*, 423 U.S. at 378-79 (citation and quotation marks omitted). "Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable

power and State administration of its own law.'" *Id.* at 378 (citation omitted).

Further, states have broad authority to enact laws that protect the public interest.

*See*, *e.g.*, *Yakus v. United States*, 321 U.S. 414, 443 (1944) ("Even the personal

liberty of the citizen may be temporarily restrained as a measure of public

safety.").[10]

### C.    Standard for facial challenges to a statute's constitutionality

Three legal principles govern the United States' facial challenge to

S.B. 1070. First, "[w]here a construction of a statute would raise serious

constitutional problems, courts 'will construe the statute to avoid such problems

unless such construction is plainly contrary to the intent of [the legislature].'" *Ctr.*

*for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 790 (9th Cir.

2008) (citation omitted).

Second, the United States must overcome the presumption that Arizona's

law enforcement officers will implement S.B. 1070 in a constitutional manner. *See*

*Panama Refining Co. v. Ryan*, 293 U.S. 388, 446 (1935) ("Every public officer is

presumed to act in obedience to his duty, until the contrary is shown . . ."); *United*

*States v. Booker,* 543 U.S. 220, 279-80 (2005) ("[In] facial invalidity cases . . . we

---

[10]    *See also Haw. Housing Auth. v. Midkiff*, 467 U.S. 229, 239 (1984) ("[W]hen
the legislature has spoken, the public interest has been declared in terms well-nigh
conclusive.  In such cases, the legislature, not the judiciary, is the main guardian of
the needs to be served by social legislation.") (citation omitted).

ought to presume whenever possible that those charged with writing and implementing legislation will and can apply 'the statute consistently with the constitutional command.'") (citation omitted).

Third, "[a] facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). When considering a facial challenge, the Court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008); *see also Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 863 (9th Cir. 2009)*, cert. granted by* 130 S. Ct. 3498 (2010) ("A speculative, hypothetical possibility does not provide an adequate basis to sustain a facial challenge."). This high standard is consistent with the well-established principle that "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (citation omitted).

In *California Coastal Commission v. Granite Rock Co*., 480 U.S. 572 (1987), for example, the Supreme Court rejected a facial challenge to the

Commission's permit requirements even though application of the requirements could conflict with federal law. The Court specifically rejected the plaintiff's argument "that the Coastal Commission's true purpose in enforcing a permit requirement [was] to prohibit [the plaintiff's] mining entirely" and held that the plaintiff's facial challenge "must stand or fall on the question [of] whether *any possible* set of conditions attached to the Coastal Commission's permit requirement would be pre-empted." *Id*. at 588. The Court then held that the Commission's "identification of a possible set of permit conditions not pre-empted by federal law [was] sufficient to rebuff [the plaintiff's] facial challenge to the permit requirement." *Id*. at 589.

### D.    Standard for demonstrating federal preemption of state law

"Congress has the power under the Supremacy Clause of Article VI of the Constitution to pre-empt state law." *Nw. Central Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 509 (1989). In determining whether a state law is preempted, "the purpose of Congress is the ultimate touchstone." *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008) (citation omitted); *see also Nw. Central Pipeline Corp*., 489 U.S. at 509 (the court's task is to "examine congressional intent"). Further, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . [a court must] 'start with the assumption that the historic police

powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth v. Levine*, 129 S. Ct. 1187, 1194-95 (2009) (citation omitted).

"Federal preemption can be either express or implied." *Chicanos Por La Causa*, 558 F.3d at 863; *Altria Group,* 129 S. Ct. at 543. Implied preemption in the immigration context exists if: (1) the state law purports to regulate immigration, an exclusively federal power; (2) federal law occupies the field; or (3) the state regulation conflicts with federal law. *See De Canas v. Bica*, 424 U.S. 351, 355-63 (1976). "Conflict preemption" is present only if "compliance with both federal and state regulations is a physical impossibility . . . or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Chicanos Por La Causa*, 558 F.3d at 863 (internal citations and quotation marks omitted).[11]

---

[11]     Neither "[t]ension between federal and state law" nor a "hypothetical conflict" is sufficient to establish conflict preemption. *Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1010 (9th Cir. 2007) (citations omitted).

## II

### The District Court Erred in Concluding that It Is Likely the United States Will Prevail on Its Preemption Claims

**A.**     **The district court erred in concluding that section 2(B) of S.B. 1070 likely impedes congressional objectives**

Section 2(B) encourages Arizona's law enforcement officers to investigate potential violations of the federal immigration laws in connection with the enforcement of other laws and where reasonable suspicion exists that the person is unlawfully present in the United States. *See* S.B. 1070, § 2(B). The district court gave three reasons for its decision that the United States was likely to succeed on its claim that federal law preempts section 2(B). First, the district court concluded that enforcement of either the first or second sentence of section 2(B) would impose "an unacceptable burden on lawfully present aliens." [ER 16, 20.] Second, the district court held that enforcing section 2(B) would increase the number of requests Arizona's law enforcement officers make "for determinations of immigration status" and, therefore, "will divert resources from the federal government's other responsibilities and priorities." [ER 17, 20.] Third, the district court construed the second sentence of section 2(B) to require that Arizona's law enforcement officers determine the immigration status of *every* person arrested, which the court then used as the basis for its conclusion that S.B. 1070 might result in unacceptable burdens. [ER 14-15.]

1. **Enforcing section 2(B) will not impose an unconstitutional burden on lawfully-present aliens**

The district court erred in concluding that enforcing section 2(B) would impose an impermissible burden on lawfully-present aliens because the court: (a) failed to apply the correct standard for the United States' facial challenge to section 2(B); (b) failed to consider *Congress'* intent with respect to state and local assistance in the enforcement of federal immigration laws; and (c) failed to articulate any *constitutional* distinction between discretionary investigations into a person's immigration status (which are indisputably permitted) and a statutory mandate to investigate a person's immigration status under the same circumstances in which discretionary investigations are permitted.

a. **The district court erroneously concluded that section 2(B) was likely preempted based on burdens it could potentially impose on a narrow category of aliens**

To demonstrate that it is likely to succeed on its facial challenge to section 2(B), the United States had to make a clear showing that no set of facts exist under which section 2(B) could be constitutionally applied. *See Salerno*, 481 U.S. at 745; *Rizzo*, 423 U.S. at 378. The United States did not do so, and the district court did not find that it had.

Rather, the district court improperly based its conclusion on the *potential* burden section 2(B) *could* impose on lawfully-present aliens and, in particular, the

- 24 -

limited category of "individuals who have applied for asylum but not yet received an adjudication, people with temporary protected status, U and T non-immigrant visa applicants, or people who have self-petitioned for relief under the Violence Against Women Act." [ER 19.] In other words, the district court found that section 2(B) is likely preempted *as applied* to lawfully-present aliens in hypothetical cases that may never arise when section 2(B) is enforced.[12] This conclusion was erroneous in the context of the United States' facial challenge to section 2(B).

Section 2(B) does not, on its face, target lawfully-present aliens—it is aimed at identifying *illegal* aliens. It is well established that law enforcement officers "may briefly stop a suspected illegal alien for questioning if the agent has reasonable suspicion based upon articulable facts." *United States v. Tarango-Hinojos*, 791 F.2d 1174, 1175 (5th Cir. 1986). The fact that a state or local police officer "'[does] not know with certainty that there was a violation of the immigration laws is not controlling.'" *United States v. Santana-Garcia*, 264 F.3d

---

[12]    Arizona presented evidence that: (1) only about .2 percent of the aliens in Arizona likely fall under one of these special categories and (2) aliens need not possess documentation to confirm their legal status because ICE can confirm the status of a lawfully-present alien using only the person's name and birth date or the person's "A" number, which similar to a citizen's social security number. [ER 139-41.] Brandon Judd stated that in his "nearly 13 years of experience as a Border Patrol Agent, no one [he has] stopped has claimed that he or she was validly present in the United States pursuant to the Violence Against Women Act, an application for asylum, a 'T' or 'U' visa, an application for temporary protected status, or the Visa Waiver Program." [ER 141.]

1188, 1193 (10th Cir. 2001) (citation omitted); *see also United States v. Soriano-Jarquin*, 492 F.3d 495, 501 (4th Cir. 2007); [ER 20 n.12 ("Many law enforcement officials already have the *discretion* to verify immigration status if they have reasonable suspicion, in the absence of S.B. 1070.").] Because section 2(B) can be enforced as to *illegal* aliens, the statute has a "plainly legitimate sweep" and cannot be invalidated or enjoined at this stage. *Wash. State Grange*, 552 U.S. at 449.

> **b.    The district court incorrectly concluded that it would frustrate Congress' intent to increase the assistance Arizona's law enforcement officers provide in the enforcement of federal immigration laws**

The law is well settled that law enforcement officers may investigate potential violations of federal immigration laws if they have "reasonable suspicion based upon articulable facts." *Tarango-Hinojos*, 791 F.2d at 1175; *Santana-Garcia*, 264 F.3d at 1193; *Soriano-Jarquin*, 492 F.3d at 501; [ER 20 n.12.] Section 2(B) does no more than require the officers to investigate an individual's immigration status if it is constitutionally permissible (and practicable) for the officers to do so. The district court, however, saw it otherwise, erroneously concluding that it would frustrate Congress' intent for Arizona to require its law enforcement officers to investigate a person's immigration status under these circumstances.

Congress' intent is "the ultimate touchstone" in determining whether section 2(B) is preempted. *Altria Group*, 129 S. Ct. at 543. Congress has expressed a clear intent to *encourage* the assistance from state and local law enforcement officers in the enforcement of federal immigration laws that section 2(B) would provide. *See* 8 U.S.C. §§ 1357(g)(10), 1373(c), and 1644; *Santana-Garcia*, 264 F.3d at 1193 (finding that "federal law 'evinces a clear invitation from Congress for state and local agencies to participate in the process of enforcing federal immigration laws'") (citation omitted).[13] Both 8 U.S.C. § 1373(a) and 8 U.S.C. § 1644 prohibit limitations or restrictions on "any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, *lawful or unlawful*, of any individual." (emphasis added). Thus, Congress expressly contemplated that state and local law enforcement officers and agencies would inquire into the immigration status of lawfully-present aliens, and Congress determined—mandated—that ICE respond because Congress concluded that this sharing of information was of critical importance in the enforcement of federal immigration laws. *See*, *e.g.*, S. Rep. No. 104-249, at 19-20 (1996).

In determining Congress' intent, the district court did not address any of these statutes or refer to any other provision of the INA or any regulation DHS

---

[13]      In fact, 81 members of Congress filed an *amicus* brief in the district court to assert their position that S.B. 1070 is consistent with congressional policy. [*See* ER 484 (docs. 66 & 67).]

promulgated pursuant to express statutory authority.[14] Instead, the district court relied on the congressional objectives described nearly 70 years ago in *Hines v. Davidowitz*, 312 U.S. 52 (1941). [ER 19-20.][15] In *Hines*, the Supreme Court determined whether the Alien Registration Act of 1940 preempted a Pennsylvania statute that required lawfully-present aliens to: "register once each year; . . . receive an alien identification card and carry it at all times; [and] show the card whenever it may be demanded by any police officer or any agent of the Department of Labor and Industry." 312 U.S. at 56. Central to the Supreme Court's decision in *Hines* was that the Pennsylvania statute imposed *additional* burdens not required by federal law: "under the federal Act [of 1940] aliens need not carry cards . . . [and] registration records and finger-prints must be kept secret and cannot be revealed except to agencies—such as a state—upon consent of the

---

[14]     The Supreme Court "has recognized that an agency regulation *with the force of law* can pre-empt conflicting state requirements. . . . In such cases, the Court has performed its own conflict determination, relying on the substance of state and federal law . . ." *Wyeth*, 129 S. Ct. at 1200-01 (emphasis added and internal citation omitted); *see also North Dakota v. United States*, 495 U.S. 423, 442 (1990) (rejecting the Department of Defense's ("DoD") preemption challenge to a North Dakota law because "[i]t is Congress—not the DoD—that has the power to pre-empt otherwise valid state laws . . .").

[15]     The district court also improperly relied on an unsupported statement from the United States regarding the federal government's intent: "The United States asserts, and the Court agrees, that 'the federal government has long rejected a system by which aliens' papers are routinely demanded and checked.'" [ER 20 (quoting the United States' Mot. for Prelim. Inj. at 26).] The United States provided no support for this assertion, which is contrary to the law and authorities cited herein.

Commissioner and the Attorney General." *Id.* at 73. Based on these limited registration requirements, the Supreme Court found that Congress had intended to leave "law-abiding aliens . . . free from the possibility of inquisitorial practices and police surveillance." *Id.* at 74.

Not only is *Hines* factually distinguishable, but Congress has also largely replaced the Alien Registration Act with the INA, which, unlike the 1940 Act, *does* make it a crime for aliens *not* to carry registration cards. *See* 8 U.S.C. § 1304(e); *Martinez v. Nygaard*, 831 F.2d 822, 828 (9th Cir. 1987) ("An individual's admission that she is an alien, coupled with her failure to produce her green card, provides probable cause for an arrest."). Since *Hines*, the Supreme Court has recognized that "[t]o safeguard the rights of those who are lawfully present . . . [DHS] has developed rules restricting stop, interrogation, and arrest practices" under which "no one [can] be detained without reasonable suspicion of illegal alienage, and . . . no one [can] be arrested unless there is an admission of illegal alienage or other strong evidence thereof." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1044-45 (1984). The Supreme Court has further held that release of an unlawfully-present alien "would *clearly frustrate the express public policy against an alien's unregistered presence in this country*." *Id.* at 1047 (emphasis added). And that "[e]ven when officers have no basis for suspecting an individual" is unlawfully

present the officers may inquire into the individual's immigration status. *Muehler v. Mena*, 544 U.S. 93, 101 (2005) (citation omitted).

This prevailing Supreme Court precedent demonstrates that section 2(B) *is* consistent with Congress' intent because section 2(B) provides the same protections to aliens that the Supreme Court identified in *Lopez-Mendoza* and furthers the "express public policy against an alien's unregistered presence in this country." 468 U.S. at 1047.

### c. The district court's factual findings were clearly erroneous

The district court recognized that Arizona's law enforcement officers may, in their discretion, investigate individuals' immigration status without imposing an impermissible burden on lawfully-present aliens. [ER 20 n.12.] In practice—in Arizona and throughout the nation—state and local law enforcement officers regularly conduct these welcomed investigations. *See*, *e.g.*, *Estrada v. Rhode Island*, 594 F.3d 56, 61 (1st Cir. 2010); *Soriano-Jarquin*, 492 F.3d at 497; *United States v. Rodriguez-Arreola*, 270 F.3d 611, 614 (8th Cir. 2001); [ER 112-13, 123-24, 135-36 & 144-45]. Section 2(B) does not change the nature of such investigations; it merely codifies the circumstances in which an officer may perform them and eliminates the possibility that law enforcement officers who previously operated under a "sanctuary" policy will refuse to perform such

investigations out of "fear that [their law enforcement agency] may negatively react to them working with ICE because of the [agency's] past comments [opposing inquiries] about a person's immigration status." [ER 114.]

The district court's findings that it would be an "unreasonable burden" for lawfully-present aliens to have to provide information to officers regarding their identity and, if reasonable suspicion exists, their citizenship as well, is not supported by the factual record that was before the court or even common experience.[16] It is well known that the first thing an officer does when he or she stops or detains any person for any reason is to ask that person for identification or information that will help the officer identify the person. [*See*, *e.g.*, ER 109-10.] Identification is sought for the officer's own safety and so that the officer can determine if there are any other issues of concern about which the officer and the public need to know (*e.g.*, outstanding warrants). [ER 109-13.]

In connection with this identification process (or the initial stop or arrest in general), if the officer also develops reasonable suspicion that the person—whether sufficiently identified or not—is not lawfully present in the United States, the officer (in a non-sanctuary city) will then most likely notify ICE or other

---

[16] Carrying identification is essential for many aspects of every day life—driving a car, cashing checks, making credit card purchases, and even entering a federal courthouse.

authorities about the issue. [ER 135-36.] If the officer has also concluded that there is probable cause to "arrest" the person for whatever crime (including misdemeanors) for which that person was originally stopped or detained (even in sanctuary cities), that person will likely be arrested and incarcerated—and not be eligible for "cite and release" pursuant to A.R.S. § 13-3903. [*See generally* ER 116-17.]

It cannot be presumed that section 2(B) will cause any measurable increase in investigations into the immigration status of lawfully-present aliens because reasonable suspicion of unlawful presence will rarely exist for a lawfully-present alien. The district court notably made no factual findings regarding the extent to which enforcement of section 2(B) will (if at all) increase the investigations into the immigration status of *lawfully-present aliens* over the current practice of discretionary investigations. [ER 20.] Section 2(B) is triggered only if a law enforcement officer makes a lawful stop, detention, or arrest. In such circumstances, law enforcement officers currently request identification as a matter of routine. [ER 109-10.] *See also Estrada*, 594 F.3d at 61; *Soriano-Jarquin*, 492 F.3d at 497. Lawfully-present aliens generally carry identification. [ER 139-40.] Even if a person does not have identification, citizens can establish their identity by providing law enforcement officers with their social security numbers and

lawfully-present aliens can do so by providing their "A" numbers—numbers that most people have memorized.[17] [ER 139-40.]

Even assuming that section 2(B) were to result in some measurable increase in the investigations Arizona's law enforcement officers make into the immigration status of lawfully-present aliens, the district court failed to articulate how such an increase would necessarily change such investigations from a permissible practice to an unconstitutional burden. Again, the practices and procedures set forth in section 2(B) are *already* recognized and accepted practices and procedures in many jurisdictions in Arizona and across the country.

> **2. Congress has expressly intended that state and local officers will utilize federal resources in the manner section 2(B) requires**

The district court found that section 2(B) was likely preempted because it would increase calls to ICE to verify individuals' immigration status and, as a

---

[17]     If a lawfully stopped, detained, or arrested alien does not have an "A" number or any documentation confirming his or her lawful status, any "burden" or inconvenience the alien would suffer would be no more than the inconvenience or burden he or she would suffer under a discretionary investigation into his or her immigration status based on reasonable suspicion of unlawful presence. As the Supreme Court has observed in the context of employment of aliens, aliens can demonstrate their authorization to obtain employment "easily," because "aliens who are authorized to work generally possess documents establishing that status. Some persons so authorized carry so-called 'green cards,' . . ., others carry employment authorization documents, . . . or registration numbers that will readily identify their status." *INS v. Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183, 195-96 (1991) (citations omitted).

result, it would "divert resources from the federal government's other responsibilities and priorities." [ER 17.] This conclusion is both legally and factually erroneous.

### a. The district court's conclusion that section 2(B) will impermissibly burden federal resources ignores Congress' intent

As support for its conclusion that section 2(B) would unduly burden federal resources, the district court cited to one declaration, that of David Palmatier, the Unit Chief for DHS's Law Enforcement Support Center ("LESC").[18] [ER 17 (citing Palmatier Decl. ¶¶ 3-6).] The district court has, in effect, found that a declaration of a single federal official can override congressional intent. That is not the law.

For a statute to be preempted based on the burden its enforcement might impose upon a federal agency, the burden must "pose an 'obstacle to the accomplishment and execution of the full purposes and objectives *of Congress*.'" *Wyeth*, 129 S. Ct. at 1200 (emphasis added); *Chicanos Por La Causa*, 558 F.3d at 863; *see also De Canas*, 424 U.S. at 356 ("(F)ederal regulation . . . should not be deemed preemptive of state regulatory power in the absence of persuasive reasons

---

[18]     "Congress established the LESC to provide alien status determination support to federal, state, and local law enforcement on a 24-hours-a-day, seven-days-a-week basis." [ER 432.]

either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.") (citation omitted). DHS can preempt state law *only* when acting pursuant to express congressional authority. *See*, *e.g.*, *North Dakota*, 495 U.S. at 442 ("It is Congress—not the DoD—that has the power to pre-empt otherwise valid state laws . . ."); *Wyeth*, 129 S. Ct. at 1207 (Breyer, J., concurring) ("The Supremacy Clause . . . requires that pre-emptive effect be given only . . . to federal standards and policies that are set forth in, or necessarily follow from, the statutory text that was produced through the constitutionally required bicameral and presentment procedures."). Neither informal agency policies[19] nor the opinion of a single DHS official has preemptive force.

Here, Congress' intent could not be more clear: ICE "*shall* respond to an inquiry by a Federal, State, or local government agency, seeking to verify or

---

[19] The DHS priorities that section 2(B) supposedly contravenes are set forth in a June 30, 2010 memorandum that the Assistant Secretary of ICE issued to ICE employees. *See* http://www.ice.gov/doclib/civil_enforcement_priorities.pdf; *see also* Ragsdale Decl. (doc. 6-4) ¶ 27. The theory that the evolving changes in "priorities" of the executive branch can have preemptive effect where: (1) those priorities conflict with clear congressional mandates; (2) Congress did not give the executive agency discretion in the underlying statute to determine the manner in which it would comply with the congressional mandate; and (3) the executive branch's "priorities" are, in any event, not properly promulgated in a regulation pursuant to express statutory authority such that they have the "force of law" (*see* note 15, *supra*) is simply inconsistent with well-established Supremacy Clause and preemption case law.

ascertain the citizenship or immigration status of any individual within the

jurisdiction of the agency for any purpose authorized by law, by providing the

requested verification or status information." 8 U.S.C. § 1373(c) (emphasis added).

Section 1373(a) further provides that "a Federal . . . government entity or official

*may not prohibit*, *or in any way restrict*, any government entity or official from

sending to, or receiving from, [ICE] information regarding the citizenship or

immigration status, lawful or unlawful, of any individual." (emphasis added).

These statutes contain no qualifications or limitations on the number or the nature

of the inquiries from state and local officials.

　　　Neither of the legal authorities upon which the district court relied in

enjoining section 2(B) addresses Congress' general intent to encourage cooperation

among federal, state, and local authorities in enforcing federal immigration laws or

Congress' specific intent in enacting 8 U.S.C. §§ 1373 and 1644. In *Buckman Co.*

*v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), the Supreme Court evaluated

Congress' intent with respect to claims involving fraud on the FDA. The *Buckman*

Court found a state law preempted based, in part, on the fact that "it would create

an incentive for individuals to 'submit a deluge of information that the FDA

*neither wants nor needs*, resulting in additional burdens on the FDA's evaluation

of an application.'" [ER 16 (quoting *Buckman*, 531 U.S. at 351) (emphasis added).]

Here, by contrast, section 2(B) calls for Arizona to provide information to ICE that

Congress has expressly invited and encouraged state and local officials and agencies to provide to ICE. And in *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043 (S.D. Cal. 2006), the district court made the same mistake the Arizona District Court made here by failing to consider the express congressional intent set forth in 8 U.S.C. §§ 1373 and 1644.[20] *Id.* at 1057.

### b. The district court's factual finding that section 2(B) will burden federal resources was clearly erroneous

Even if the district court could properly rely on the Palmatier declaration, the declaration is insufficient to show that section 2(B) would impose an impermissible burden on federal resources. Palmatier conceded that the LESC "has the capacity to handle approximately 1.5 million [inquiries into immigration status per year" and that, in 2009, "[t]he LESC processed just over 1,000,000" inquiries. [ER 436-37.] In 2009, the LESC received approximately 80,000 inquiries from Arizona's law enforcement officers. [ER 437.] Palmatier did not even attempt to guess as to the number of additional inquiries the LESC would receive from

---

[20]     In *Garrett*, the district court enjoined a city ordinance that prohibited landlords from renting to illegal aliens and required city officials, in the enforcement of the ordinance, to verify a person's immigration status pursuant to 8 U.S.C. § 1373(c). *Garrett*, 465 F. Supp. 2d at 1047-48. The district court found that the verification requirement would likely put an impermissible burden on federal resources because the federal government's applicable automated system was designed to exclude illegal aliens from receiving *public* benefits, whereas the challenged ordinance sought to deprive illegal aliens in the City of Escondido from receiving *private* benefits. *Id.* at 1057.

Arizona's law enforcement officers if section 2(B) is enforced. Rather, Palmatier only speculated that *if* section 2(B) is enforced and "[*i*]*f* the LESC's capacity to respond to requests for assistance is exceeded, . . . ICE *might* have to divert personnel from other critical missions to serve the needs of our law enforcement partners." [ER 437-38.][21] Thus, Palmatier's declaration does not support the district court's conclusion that: "Federal resources *will* be taxed and diverted from federal enforcement priorities as a result of the increase in requests for immigration status determination that will flow from Arizona . . ." [ER 20 (emphasis added).]

Moreover, it is not the case that Arizona's law enforcement officers *must* contact the LESC each time the officers inquire into a person's immigration status. Arizona has many law enforcement officers certified under 8 U.S.C. § 1357(g) (known as "Section 287(g) officers") who can access ICE's computer databases directly, and several automated systems provide an alternate resource for investigating individuals' immigration status. *See* S.B. 1070, § 2(E)(1); *see also* *Soriano-Jarquin*, 492 F.3d at 498 (noting the use of ICE's Automated Fingerprint

---

[21]     Arizona submitted a declaration from the Director of Policy Studies for the Center of Immigration Studies, who found "little empirical or logical support for the idea that even adding queries resulting from traffic stops and other non-arrest encounters will produce a sufficient number of new queries to adversely impact LESC operations." [ER 199.] The Director also noted that, when New Jersey implemented a policy that would increase inquiries to LESC, "ICE embraced the changes and even hired 10 additional ICE removal officers to handle the increased workload." [ER 197-98.]

Identification System). And section 2(B) does not (and could not) require ICE to take any action in response to the information Arizona's law enforcement officers provide.

> ### 3. As a matter of law, the district court incorrectly interpreted the second sentence of section 2(B) to mean that officers must determine the immigration status of *every* arrestee

The district court agreed with the United States that the second sentence of section 2(B) should be read in isolation to require that Arizona's state and local law enforcement officers determine the immigration status of "[a]ny person who is arrested." [ER 15.] In doing so, the district court rejected Arizona's interpretation of its own statute—that section 2(B) should be read in connection with the overall purpose of the provision to require that officers determine the immigration status of an arrestee *only* where reasonable suspicion exists that the person is unlawfully present in the United States. [ER 14.] The district court's interpretation of the second sentence drove its conclusion that the provision was likely preempted because its enforcement would "burden[] lawfully-present aliens" and "divert federal resources from the federal government's other responsibilities and priorities." [ER 16-17.]

Although Arizona acknowledges that the sentence could have been more artfully worded to expressly clarify that its provisions tie into the provisions in the sentences that precede and follow it, the district court's interpretation nevertheless

- 39 -

runs afoul of several well-established principles for construing statutory language. First, as stated above, statutes must be construed to avoid constitutional problems unless the construction is "*plainly contrary to* the [legislature's] intent." *Ctr. For Bio-Ethical Reform*, 533 F.3d at 790 (emphasis added); *see also Ariz. Downs v. Ariz. Horsemen's Found.*, 637 P.2d 1053, 1057 (Ariz. 1981) ("All statutes are presumed to be constitutional and any doubts will be resolved in favor of constitutionality.") (internal citations omitted). Second, "[s]tatutes must be given a sensible construction which will avoid absurd results." *Porter v. Triad of Ariz. (L.P.)*, 52 P.3d 799, 802 (Ariz. Ct. App. 2002) (citation omitted). Third, "[s]tatutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme," where, for example, "only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (internal citations omitted).

Here, the Arizona Legislature's stated purpose in enacting S.B. 1070 was to ensure "the cooperative enforcement of federal immigration laws throughout all of Arizona." S.B. 1070, § 1. And section 2 mandates that it "shall be implemented in a manner consistent with federal laws regulating immigration, protecting the civil

rights of all persons and respecting the privileges and immunities of United States citizens." S.B. 1070, § 2(L).

The first sentence of section 2(B), which specifically includes "arrests," clearly contemplates that investigations into a person's immigration status will be performed *only* if reasonable suspicion exists to believe that the person is unlawfully present in the country. The fourth sentence sets forth very broad presumptions as to who is not an alien unlawfully present in the United States. Interpreting the second sentence in isolation to require investigations into the immigration status of *all* persons—even those that the statute specifically provides are presumed to be lawfully present and U.S. citizens who never have had, and never will have, an "immigration status"—would yield absurd results, potentially result in the provision's invalidation, and do little if anything to further the Legislature's intent in enacting S.B. 1070.[22] To yield logical results—consistent

---

[22]    Presently, Arizona's law enforcement agencies determine the citizenship of all arrestees who are "brought to a law enforcement agency for incarceration." *See* A.R.S. § 13-3906(A); Article 36 of the Vienna Convention on Consular Relations. Once the agency determines that an arrestee is a U.S. citizen, it would be futile for the agency to attempt to determine the person's immigration status because a United States citizen does not have an immigration status. [*See*, *e.g.*, ER 435-38 (noting that a search for the immigration status of a United States citizen should result in a "no match" finding).] The fact that a United States citizen does not have an "immigration status" further demonstrates that the second sentence of section 2(B) applies only to aliens that the officer has reasonable suspicion to believe are not lawfully present in the country.

with the Arizona Legislature's intent[23]—and to ensure that the provision is construed in a constitutional manner, the second sentence of section 2(B) should be construed in connection with the first sentence to require that Arizona's law enforcement officers determine the immigration status of arrestees *only* if reasonable suspicion exists to believe that the person is unlawfully present in the country.[24]

If the Court rejects Arizona's construction of the second sentence of section 2(B) and, instead, construes section 2(B) to require investigations into the immigration status of *all* arrestees and further finds that it would be unconstitutional to do so, the Court should sever (or enjoin)—or instruct the district court to enjoin—*only* this sentence. *See*, *e.g.*, S.B. 1070, § 12(A) (Severability Clause); *see also State v. Ramsey*, 831 P.2d 408, 414 (Ariz. Ct. App.

---

[23]     In analyzing the Arizona Legislature's intent, the district court focused on the fact that the Legislature added the word "arrest" in the first sentence of section 2(B) when it amended S.B. 1070 via H.B. 2162. [ER 14-15.] But the fact that the Legislature added the word "arrest" in the first sentence demonstrates that the reasonable suspicion requirement applies across-the-board and that the second sentence simply imposes a greater burden on officers to determine and verify the immigration status when the person at issue has been arrested. The district court's interpretation of the meaning and interplay of "arrest" in the first two sentences also arguably renders "arrest" in the first sentence to be pure surplusage, which runs afoul of a well-established principle of statutory construction.

[24]     The second sentence of section 2(B) should also be construed to limit the detention of any person pending an investigation into the person's immigration status to a reasonable time. *See*, *e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001).

1992) ("A court should not declare an entire statute unconstitutional if the constitutional portions can be severed from those which are unconstitutional.") (citation omitted); *Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 886 (9th Cir. 2008) ("[W]hen the constitutionality of a state statute is challenged, principles of state law guide the severability analysis.").

### B.      Because section 3 mandates compliance with federal law, it cannot stand as an obstacle to congressional objectives

Relying solely on *Hines*, the district court held that section 3 (requiring unlawfully-present aliens to comply with federal immigration registration laws) is likely preempted because the state-law penalties it imposes for violations of federal registration laws "stand[] as an obstacle to the uniform, federal registration scheme and [section 3] is therefore an impermissible attempt by Arizona to regulate alien registration." [ER 23.] *Hines* does not support the district court's conclusion.

The *Hines* Court did not establish a *per se* bar on state laws touching upon alien registration. Rather, the Court held that "where the federal government, in the exercise of its superior authority in [the field of immigration], has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." 312 U.S. at 66-67. The Court held that

- 43 -

Congress' purpose in enacting "a standard for alien registration" was "to protect the personal liberties of law-abiding aliens through one uniform national registration system" and that the Pennsylvania statute interfered with that purpose by imposing *additional* burdens on law-abiding aliens that would likely result in "inquisitorial practices and police surveillance" unrelated to any congressional objectives. *Id.* at 74 (emphasis added) *see also De Canas*, 424 U.S. at 363 (noting that the statute preempted in *Hines* "imposed burdens on aliens lawfully within the country that created conflicts with various federal laws").

Section 3 of S.B. 1070 does not implicate any of the concerns that led the *Hines* Court to invalidate Pennsylvania's alien registration statute. It does not require an alien to carry any additional documentation not required by federal law. Nor does it apply to law-abiding aliens or any alien that has authorization from the federal government to remain in the country. *See* S.B. 1070, § 3(F). Nor is section 3 inconsistent with Congress' objectives in any respect. Not only has Congress *invited* states to reinforce federal alien classifications, but Congress has, in many instances, required states to do so. *See*, *e.g.*, 8 U.S.C. §§ 1621 through 1625 (prohibiting certain aliens from receiving state and local benefits and authorizing states to limit certain aliens' eligibility for benefits); 8 U.S.C. § 1324a(h)(2) (permitting states to impose sanctions upon employers who employ unauthorized aliens through licensing and similar laws); Real ID Act of 2005, Pub. L. 109-13,

- 44 -

119 Stat. 302 (May 11, 2005) (requiring that states verify a person's lawful presence before issuing the person a driver's license).

*Medtronic* shows the error in the district court's analysis. In *Medtronic*, the Supreme Court directly addressed and rejected an argument that a state-law cause of action that was narrower than federal law was preempted because it was "different from" the federal requirement. The Court held that "[w]hile such a narrower requirement might be 'different from' the federal rules in a literal sense, such a difference would surely provide a strange reason for finding pre-emption of a state rule insofar as it duplicates the federal rule." 518 U.S. at 495. The Court further held that "[t]he presence of a damages remedy does not amount to the additional or different 'requirement' that is necessary under the [preemption provision]; rather, *it merely provides another reason for manufacturers to comply with identical existing 'requirements' under federal law*." *Id.* (emphasis added).

A panel of this Court similarly found that a California statute requiring appliance manufacturers to display "[t]he marking required by 16 C.F.R. Part 305 (2001)" was not preempted because it "merely provides appliance manufacturers another reason to comply with existing requirements under federal law." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 502-03 & n.10 (9th Cir. 2005). In reaching this conclusion, this

- 45 -

Court relied on both *Medtronic* and a case in which the Fourth Circuit held that "'if state law adopts or imposes a . . . requirement that is the same as the federal standard, even if the state law provides compensation or other remedies for a violation, *so long as Congress chooses not to explicitly preempt consistent law*, it will not be said to conflict with federal law.'" *Id.* at 502 (emphasis added) (quoting *Worm v. Am. Cyanamid Co.*, 970 F.2d 1301, 1307 (4th Cir. 1992)).[25] Although Congress has amended the INA at least a dozen times since 1952, it has never expressly preempted concurrent state regulation. *See*, *e.g.*, *Wyeth*, 129 S. Ct. at 1200 ("'The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them.'") (citation omitted).

### C.    Section 5(C) neither conflicts with federal law nor regulates in a federally-occupied field

Section 5(C) makes it "unlawful for a person who is unlawfully present in the United States and who is an unauthorized alien to knowingly apply for work,

---

[25]    *See also In re Jose C.*, 198 P.3d 1087, 1100 (Cal. 2009), *cert. denied*, 129 S. Ct. 2804 (2009) ("Where state law 'mandates compliance with the federal immigration laws and regulations, it cannot be said [state law] stands as an obstacle to accomplishment and execution of congressional objectives embodied in the INA.'") (citations omitted).

solicit work in a public place or perform work as an employee or independent contractor in this state."[26]

The district court recognized that section 5(C) "regulates the employment of unauthorized aliens in Arizona, and, thus, a presumption against preemption applies in the context of this provision." [ER 24-25.] *See also Wyeth*, 129 S. Ct. at 1194-95 (stating that the presumption against preemption applies "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied'"). Nevertheless, the district court held that "Congress has comprehensively regulated in the field of employment of unauthorized aliens," and, therefore, that the United States "is likely to succeed on its claim that . . . Section 5(C) of S.B. 1070, conflicts with a comprehensive scheme and is preempted." [ER 27.] It is unclear from the district court's order whether it relied upon field preemption or conflict preemption—two distinct subcategories of implied preemption, *see Chicanos Por La Causa*, 558 F.3d at 863—to enjoin section 5(C). The district court appears to have found, however, that Congress has occupied "the field of employment of unauthorized aliens" [ER 27] and, therefore, that any state regulation related to the employment

---

[26]     The Supreme Court has recognized the harm that can result from employment of illegal aliens, particularly in times of high unemployment. *See De Canas*, 424 U.S. at 356-57. These problems are particularly acute in Arizona. [*See* ER 276-77.]

of unauthorized aliens is *per se* preempted. Regardless of which form of implied preemption the district court relied upon, it erred in its conclusion that IRCA preempts section 5(C).

> ### 1.    IRCA does not occupy the field and preclude all state regulation of alien employees who perform unauthorized work

Field preemption occurs "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it." *Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc.*, 423 F.3d 1056, 1072 (9th Cir. 2005) (citation omitted).

> #### a.    IRCA's express preemption provision demonstrates that Congress did not intend to occupy the field

Both this Court and the Supreme Court have repeatedly determined that, by enacting a limited express preemption provision, Congress did *not* intend to occupy the legislative field. *See*, *e.g.*, *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995) (when an express preemption provision "provides a reliable indicium of congressional intent with respect to state authority . . . there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation") (internal citations and quotation marks omitted); *Chicanos Por La Causa*, 558 F.3d at 867 (rejecting an argument that IRCA preempts state laws requiring E-Verify participation); *Metrophones*, 423 F.3d at 1072 ("The presence

- 48 -

of an express preemption provision supports an inference that Congress did not intend to preempt matters *beyond* the reach of that provision.");[27] *see also Altria Group*, 129 S. Ct. at 543 ("[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'") (citation omitted).

IRCA's express preemption clause is limited, preempting sanctions on *employers* only. *See* 8 U.S.C. § 1324a(h)(2).[28] In sharp contrast, section 5(C) is directed at *employees*. Congress could have, but chose not to, expressly preempt state laws that impose sanctions on employees. *See* 8 U.S.C. § 1324a(h)(2). This is a strong indicator that Congress did not intend to preempt state laws that sanction employees, particularly where, as here, there is a presumption against preemption of state law. *See Chicanos Por La Causa*, 558 F.3d at 864.

---

[27]   In *Metrophones*, a panel of this Court concluded that "by expressly limiting federal preemption to state requirements that are *inconsistent* with the federal regulations, Congress signaled its intent not to occupy the entire field." 423 F.3d at 1072.

[28]   IRCA's express preemption provision states: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."  8 U.S.C. § 1324a(h)(2).

### b. The fact that Congress considered but did not enact employee sanctions does not reflect a "clear and manifest" intent to occupy the field

The district court found that IRCA occupies the legislative field based, in large part, on the fact that Congress considered, but rejected proposals to impose criminal sanctions against the employee when it enacted IRCA. [ER 25-26.] The district court relied on *Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495 (1988), in which the Supreme Court recognized that Congress *could* preempt state law by occupying the legislative field, but found that Congress had *not* done so in the case before it.[29] *Id.* at 500-01. Instead, the Court applied the presumption against preemption and found that the Emergency Petroleum Allocation Act ("EPAA") did not clearly and manifestly preempt a Puerto Rico statute that empowered its Department of Consumer Affairs with regulatory authority over "the prices of gasoline and other products sold in the Commonwealth." *Id.* at 498-501. In so holding, the Supreme Court rejected the argument that statements in the legislative history of the EPAA reflecting "congressional approval of a free market in petroleum products" had preemptive

---

[29]    In the portion of the *Puerto Rico* opinion upon which the district court relied, the Supreme Court distinguished the case before it from *Transcontinental Pipe Line Corp. v. State Oil & Gas Board of Mississippi*, 474 U.S. 409, 411, 421-22 (1986), in which the Supreme Court held that the Natural Gas Policy Act of 1978 ("NGPA") occupied the legislative field. *See also Nw. Central Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 513-14 (1989) (noting that the *Transcontinental* Court had held that the NGPA occupied the field).

force and held that: "Without a text that can, in light of [Congress'] statements, plausibly be interpreted as *prescribing* federal pre-emption it is impossible to find that a free market was mandated by federal law." *Id.*; *see also United States v. Price*, 361 U.S. 304, 310-11 (1960) ("[N]on-action by Congress affords the most dubious foundation for drawing positive inferences.").

The issue in this case is more closely aligned with *Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002), in which the Supreme Court held that neither the Federal Boat Safety Act of 1971 ("FBSA") nor the Coast Guard's decision "not to adopt a regulation requiring propeller guards on motorboats"[30] preempted state common-law claims that a motor boat without propeller guards was unreasonably dangerous. After finding that the FBSA's express preemption provision did not preempt the state-law claims, the Supreme Court held that "although the Coast Guard's decision not to require propeller guards was undoubtedly intentional and carefully considered," the FBSA did "not convey a 'clear and manifest' intent . . . to . . . implicitly pre-empt all state common law relating to boat manufacture." *Id.*

---

[30]     As the Supreme Court noted in *Sprietsma*: "Section 5 of the FBSA . . . authorizes the Secretary of Transportation to issue regulations establishing 'minimum safety standards for recreational vessels and associated equipment,' and requiring the installation or use of such equipment. The Secretary has delegated this authority to the Coast Guard." 537 U.S. at 57. The INA, by contrast, does not authorize any executive agency to impose sanctions on unauthorized employees.

at 67. Rather, the Court held that the fact that "the Act's express pre-emption clause does not cover common-law claims suggests the opposite intent." *Id.* at 69.[31]

### 2. Section 5(C) does not conflict with any provision of IRCA

The district court did not identify any actual conflict between section 5(C) and any provision of federal law. *See Chicanos Por La Causa*, 558 F.3d at 863 ("For conflict preemption to apply, the conflict must be an actual conflict, not merely a hypothetical or potential conflict."). To the contrary, the district court expressly recognized that Congress has "require[d] that an individual seeking employment 'attest, under penalty of perjury . . . that the individual is a citizen or national of the United States, an alien lawfully admitted for permanent residence, or an alien who is authorized . . . to be hired, recruited, or referred for such employment.'"  [ER 26 (quoting 8 U.S.C. § 1324a(b)(2)).]  Section 5(C) clearly furthers the strong federal policy of prohibiting illegal aliens from seeking employment in the United States. There is no basis, therefore, for a finding that section 5(C) stands as an obstacle to any congressional objectives; it is certainly possible to comply with both section 5(C) and federal law.

---

[31]    The existence of an express preemption provision does not preclude a conflict preemption analysis, but, for the reasons stated in the following section, section 5(C) does not conflict with IRCA.

**D.  Because there are permissible applications of section 6, the district court erred in concluding that the provision is unconstitutional on its face**

Section 6 amends A.R.S. § 13-3883(A) by authorizing an Arizona peace officer to "arrest a person if the officer has probable cause to believe . . . . [t]he person to be arrested has committed any public offense that makes the person removable from the United States." Nothing in S.B. 1070—or any other provision of state or federal law—authorizes Arizona's law enforcement officers to *decide* whether a person is removable. Nevertheless, the district court found that the United States is likely to succeed on its claim that federal law preempts section 6 because, as a result of "the substantial complexity in determining whether a particular public offense makes an alien removable from the United States and the fact that this determination is ultimately made by federal judges, there is a substantial likelihood that officers will wrongfully arrest legal resident aliens under the new A.R.S. § 13-3883(A)(5)." [ER 33.] The district court's finding was both legally and factually erroneous.

**1.  The district court failed to apply the correct legal standard for the United States' facial challenge to section 6**

The district court did not find, as it was required to do, that the United States had made a clear showing that section 6 is likely unconstitutional in *all* of its applications. *See*, *e.g.*, *Salerno*, 481 U.S. at 745. There are clearly circumstances in which an arrest under section 6 would be constitutional. For example, federal law

expressly permits state and local law enforcement officers to arrest aliens who have previously been deported or left the United States after a felony conviction, but only if state law provides such authority. *See* 8 U.S.C. § 1252c. The purpose of the arrest in such circumstances is "to take the individual into Federal custody for purposes of deporting or removing the alien from the United States." *Id.*

> **2.    The district court failed to presume that Arizona will properly implement section 6 and to construe section 6 to preserve its constitutionality**

Even if the district court could enjoin section 6 based on the potential that Arizona's law enforcement officers would make unlawful arrests, the district court failed to presume that Arizona's law enforcement officers will implement section 6 in a constitutional manner, *see Panama Refining Co.*, 293 U.S. at 446; *Booker*, 543 U.S. at 279-80, and, instead improperly presumed that Arizona's law enforcement officers would implement section 6 in an *unconstitutional* manner.

The district court also failed to recognize its obligation to construe section 6 to avoid constitutional problems. *See Ctr. for Bio-Ethical Reform*, 533 F.3d at 790. To the extent the district court was concerned that Arizona's law enforcement officers were likely to implement section 6 in an unconstitutional manner, the district court should have construed section 6 so as to require officers to confirm with federal authorities that an alien has committed a public offense that makes the alien removable before making a warrantless arrest under section 6.

3. **The district court disregarded evidence demonstrating that section 6 can be applied in a constitutional manner**

Evidence presented from *both* sides provides further support that section 6 has constitutional applications. Arizona's law enforcement officers regularly communicate with federal authorities and their authorized agents regarding the immigration status of aliens. [*See generally* ER 431-39.] If federal authorities or a Section 287(g) Officer[32] confirms that the alien has been found removable or has committed an aggravated felony or other offense that would make the alien removable,[33] A.R.S. § 13-3883(A)(5) merely provides Arizona's law enforcement officers with the authority to arrest and, in connection with A.R.S. § 11-1051(D), transport the person directly to a federal agency for processing.[34]

The district court's conclusion that there was no "evidence that LESC would be able to advise an officer whether a particular offense makes an alien removable" was clearly erroneous. [ER 33 n.21.] Congress has required the federal government

---

[32] As stated above, a Section 287(g) Officer is an officer certified under 8 U.S.C. § 1357(g) to enforce federal immigration laws.

[33] Federal law provides a presumption of deportability for aggravated felonies. *See* 8 U.S.C. § 1228(c) ("An alien convicted of an aggravated felony shall be conclusively presumed to be deportable from the United States"). 8 U.S.C. § 8 U.S.C. § 1101(a)(43) defines "aggravated felony."

[34] Section 6 was also enacted to fill a potential gap in Arizona law that was identified by this Court in *Gonzales v. Peoria,* 722 F.2d 468 (1983), *overruled on other grounds by Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999) and as analyzed by the Department of Justice in its 2002 legal opinion that further addressed this potential gap. [ER 346-59.]

- 55 -

"to maintain a current record of aliens who have been convicted of an aggravated felony, and . . . those who have been removed." 8 U.S.C. § 1226(d)(1)(C). Even the Department of Justice ("DOJ") has concluded that state police can "arrest[] aliens on the basis of civil deportability." [ER 359.][35] Moreover, the declaration of David Palmatier—the declaration upon which the district court relied in concluding that federal law preempts section 6—confirms that DHS's National Crime Information Center ("NCIC") database identifies aliens who have been found removable but have absconded and aliens who have previously been deported for committing aggravated felonies. [ER 432.] Arizona also presented the declaration of Neville Cramer, a 26-year veteran of ICE, who stated that the LESC was designed to include information such as "deportation orders" to local law enforcement officers. [ER 185.] And the district court recognized that there are certain crimes, such as murder, for which both ICE and Arizona's law enforcement officers *can* determine that an alien would be removable. [ER 91 at 48:12-15.][36]

---

[35] In reaching this conclusion, however, the DOJ presumed that the "States have conferred on state police the necessary state-law authority to make arrests for violations of the federal immigration laws." [ER 348.]

[36] 8 U.S.C. § 1227(a)(2)(A)(iv), which states: "Any alien who is convicted of a violation of section 758 of title 18 . . . is deportable," provides another situation in which Arizona's law enforcement officers can easily determine that an alien is removable.

### III

### The District Court's Errors With Respect to the United States' Likelihood of Success on the Merits Requires Reversal of the District Court's Conclusions with Respect to the Non-Merits Factors

The United States is not entitled to a preliminary injunction unless it can demonstrate—in addition to a likelihood of success on the merits—that it is likely to suffer irreparable harm if an injunction does not issue, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Winter*, 129 S. Ct. at 374. In *Winter*, the Supreme Court held that "a proper consideration of [the irreparable injury and public interest] factors alone require[d] denial of the requested injunctive relief" without regard for whether "plaintiffs have also established a likelihood of success on the merits." *Id*. at 376; *see also Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 443 (5th Cir. 1981) (affirming the denial of an injunction where the harm to the general public outweighed the harm to the plaintiffs).

The district court's conclusion that federal law likely preempts sections 2(B), 3, 5(C), and 6 of S.B. 1070 also led the district court to conclude that: (1) "[i]f enforcement of the portions of S.B. 1070 for which the Court finds a likelihood of preemption is not enjoined, the United States is likely to suffer irreparable harm" and (2) "it is not in the public interest for Arizona to enforce preempted laws." [ER 34-35.] Because the district court erred in finding that

federal law likely preempts sections 2(B), 3, 5(C), and 6 of S.B. 1070, the district court's findings that the United States had met its burden with respect to the non-merits factors must also be reversed.

Based on the factual record submitted to the district court, this Court should find that the non-merits factors weigh heavily in favor of denying the United States' motion for a preliminary injunction. The United States will not suffer any harm (let alone irreparable harm) if the provisions of S.B. 1070 at issue go into effect. Arizona, by contrast, is suffering serious consequences under the status quo. As the district court found, Arizona and its citizens are suffering from "rampant illegal immigration, escalating drug and human trafficking crimes, and serious public safety concerns." [ER 1.] Even the federal government has determined that certain of Arizona's lands are so dangerous that the federal government has posted signs within 30 miles of Phoenix and 80 miles north of the Arizona-Mexico border stating "DANGER – PUBLIC WARNING, TRAVEL NOT RECOMMENDED," and describing the drug and human smuggling, prevalence of criminals, and garbage that pervade the lands just south of the largest metropolis in the State. [ER 161-67.]

In enforcing the provisions of S.B. 1070 that the district court enjoined, Arizona seeks to ensure that Arizona's law enforcement officers will provide federal law enforcement agencies the assistance that Congress has expressly

invited the states to provide and that the federal agencies desperately require to enforce the federal immigration laws effectively. Enforcing sections 2(B), 3, 5(C), and 6 of S.B. 1070 will benefit Arizona and its citizens substantially, further congressional objectives, and benefit, not harm, federal law enforcement agencies. *See Marsh v. United States*, 29 F.2d 172, 174 (2d Cir. 1928) ("[I]t would be unreasonable to suppose that [the federal government's] purpose was to deny itself any help that the states may allow."). The district court's injunction must be reversed.

## Conclusion

The United States faced a heavy burden in establishing its entitlement to a preliminary injunction enjoining Arizona from enforcing S.B. 1070. The United States fell far short of meeting that burden. The district court's finding that the United States is likely to prevail on its claims that sections 2(B), 3, 5(C), and 6 of S.B. 1070 are preempted failed to apply the correct standard for the United States' facial challenge to these provisions, failed in its analysis of Congress' intent, and erroneously accepted at face value all of the United States' factual assertions. The serious errors in the district court's preliminary injunction order require that the order be vacated.

Dated: August 26, 2010

                SNELL & WILMER L.L.P.
                John J. Bouma
                Robert A. Henry
                Joseph G. Adams

            By: s/John J. Bouma
                  John J. Bouma
                  Attorneys for Appellants,
                  Janice K. Brewer and the State of Arizona

## Certificate of Compliance

The undersigned certifies under Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and Ninth Circuit Rule 32-1, that the attached opening brief is proportionally spaced, has a type face of 14 points or more and, pursuant to the word-count feature of the word processing program used to prepare this brief, contains 13,979 words, exclusive of the matters that may be omitted under Rule 32(a)(7)(B)(iii).

Pursuant to Ninth Circuit Rule 28-2.6, Appellants confirm that they are not aware of any related cases pending in this Court, other than proceedings that may be pending with *pro se* litigants who may have issues pending before this Court relating to the Arizona S.B. 1070 litigation. *See e.g.*, Ninth Circuit Case No. 10-16737 & ER 487 (doc. 106) (notifying *pro se* party that it has no appeal rights).

Dated: August 26, 2010

<div style="margin-left:40%">

SNELL & WILMER L.L.P.
John J. Bouma
Robert A. Henry
Joseph G. Adams

By: s/John J. Bouma
    John J. Bouma
    Attorneys for Appellants,
    Janice K. Brewer and the State of Arizona

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 26, 2010 I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Tony West
Dennis K. Burke
Arthur R. Goldberg
Varu Chilakamarri
Joshua Wilkenfeld
U.S. Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530

s/John J. Bouma

11846483